J-S01032-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: E.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: LAWERENCE COUNTY CHILD AND YOUTH SERVICES | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 950 WDA 2022 |

Appeal from the Order Entered July 18, 2022
In the Court of Common Pleas of Lawrence County Civil Division at
No(s):  20 of 2020,
2021-20040

| | | |
|---|---|---|
| IN THE INTEREST OF: E.J.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: LAWRENCE COUNTY CYS | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1084 WDA 2022 |

Appeal from the Order Entered July 18, 2022
In the Court of Common Pleas of Lawrence County Orphans' Court at
No(s):  20040 of 21 O.C.-A

BEFORE:   BENDER, P.J.E., KUNSELMAN, J., and COLINS, J.*

MEMORANDUM BY COLINS, J.:                    **FILED: MARCH 8, 2023**

Lawrence County Children and Youth Services ("LCCYS") appeals from

the order of the Court of Common Pleas of Lawrence County Orphans' Court

("orphans' court"), which denied LCCYS's petition for a goal change to

---

* Retired Senior Judge assigned to the Superior Court.

adoption and the termination of the parental rights of W.W. ("Mother") to her son, E.W. ("Child"), born in November 2017.[1]  After careful review, we affirm.

The record shows that LCCYS's supervision commenced with an initial report regarding Child's older sibling's behavior, on January 30, 2020, when Mother, Child, and Child's older sibling were residing at a LCCYS crisis shelter due to homelessness; the family was asked to leave the shelter due to the older sibling's behavior, which included assaulting Mother, self-harming, running away, and marijuana and cocaine use.  LCCYS Shelter Care Application, 2/27/20.  According to the allegations contained in the shelter care application, Mother signed a voluntary entrustment agreement for Child's older sibling, who was placed in a group home, and Mother and Child moved into a friend's home in Beaver County.  *Id*.

On February 19, 2020, Beaver County Child and Youth Services ("BCCYS") received a call from the Beaver County Police stating that Child had been found wandering around alone outside the Beaver County residence where Mother was staying with Child. *Id*.  Mother admitted to a caseworker

_____

[1] The orphans' court also terminated the parental rights of Child's unknown natural father.  *See* Order, 7/18/22.  Initially, Mother could not identify Child's natural father, LCCYS filed a petition to give notice to the unknown father by publication and service was properly made.  However, Mother named M.M. as possible father for the first time at a December 9, 2021 hearing, and the orphans' court ordered DNA paternity testing.  As of the termination of parental rights hearing, held on February 25, 2022, the test results were not yet available.  Following the testimony and presentation of evidence, the orphans' court recessed, to determine whether or not M.M. was in fact the natural father of Child prior to rendering its decision. The DNA paternity tests showed a zero percent probability that M.M. is the natural father of Child.  *Id*.

that she had relapsed on crack cocaine, and was awaiting admission to rehab at the House of Healing in Erie, but there was not an opening until mid-March. *Id.* According to a LCCYS court summary prepared for the adjudicatory hearing held March 9, 2020, on the date Child was found wandering outside, a BCCYS supervisor contacted LCCYS supervisor Amber Pieri regarding Child, and reported to her that after Child was found, and transported to the Beaver County police station; Mother picked up Child there and the BCCYS caseworker followed Mother back to the home where she was staying to ensure its safety. LCCYS Court Summary, 3/3/20. The BCCYS caseworker found the home to be safe, but the owner told her that Mother could remain there for only two more days. *Id*.

On February 24, 2020, an LCCYS caseworker contacted Mother regarding Child's older sibling and they discussed Mother's desire that the older child remain in the group home; Mother informed the LCCYS caseworker that she intended to go to rehab and that she was still homeless. *Id.* On February 26, 2020, a LCCYS caseworker met the Beaver County police at the address where Mother was staying in Beaver Falls and found Mother standing outside holding Child, who wore only a diaper; the caseworker explained that Child would be removed and Mother "got the child dressed and did not show any emotion," and "did not ask where the foster home was located." *Id*. Mother told the LCCYS caseworker that she was trying to find housing and needed help. *Id*. Child was placed in a LCCYS foster home located in New Castle, Lawrence County and remained there until April, when Child was

transferred, with Mother's consent, to a different foster home, also in Lawrence County, where he has remained. *Id*.; Emergency Motion to Modify Placement, 4/24/20. On the day after Child was removed from Mother's care, Mother tested positive for cocaine and marijuana; the summary indicates that Mother has had previous children and youth services involvement in Beaver, Crawford, Erie, and Venango Counties. LCCYS Court Summary, 3/3/20.

The May 21, 2020 disposition order finding Child dependent indicates that the LCCYS has made reasonable efforts to prevent or eliminate the need for removal of Child from the home. Disposition Order, 5/21/20. A court summary prepared by a LCCYS caseworker for the dependency hearing notes frequent contact with Child's maternal grandmother, who cannot keep Child full-time, but who wishes to give Child's foster family a break by taking Child every other weekend, and notes that these visits were approved and began on May 16, 2020. LCCYS Court Summary, 5/21/20. That summary further notes that Mother completed inpatient drug and alcohol therapy at Alpine Springs, in Crawford County, is currently residing in a three-quarter house in Pittsburgh, and is enrolled in intensive outpatient drug and alcohol treatment at Greenbriar Treatment Center, located in Pittsburgh. *Id*. In addition, the summary states that Mother is also receiving mental health treatment at Bloomfield-Garfield, in Pittsburgh. *Id*.

The court summary prepared by LCCYS for the August 27, 2020 permanency review indicates that LCCYS spoke to Mother and staff at her recovery house and it was reported that she left the house on July 31, 2020

- 4 -

and had not returned, and did not wish to return. LCCYS Court Summary, 8/7/2020. The summary states that on August 4, 2020, the LCCYS caseworker received a letter from the Greenbriar Treatment Center stating that Mother had not been attending the program, and that as of August 6, 2020, Mother was in between three-quarter houses, and staying with friends. *Id*. The August 27, 2020 permanency review order indicates Mother's minimal compliance with the permanency plan and no progression in services.[2] Permanency Review Order, 8/27/20. The order further indicates that LCCYS has made reasonable efforts to finalize Child's permanency plan, and "is properly supervising this family," and that the permanency plan developed for Child is appropriate and feasible. *Id*.

Permanency review orders issued following video conference hearings held on February 22, 2021 and August 9, 2021 each indicate that LCCYS has made reasonable efforts to finalize Child's permanency plan and is properly supervising the family. Permanency Review Orders, 2/22/21, 8/9/21.

On September 23, 2021, LCCYS filed a petition to change the permanency goal from reunification to adoption and to terminate Mother's parental rights to Child pursuant to 23 Pa.C.S. § 2511(a)(5), (8) and (b). A

_____

[2] Mother's family service plan/permanency plan objectives were as follows: maintain positive and regular visitation with Child; demonstrate emotional and personal stability; complete a psychological evaluation and follow any recommendations; address drug and alcohol issues; provide clean drug tests; follow recommendations regarding drug and alcohol treatment; secure and maintain adequate housing; cooperate with LCCYS and all service providers; and improve parenting skills. LCCYS Court Summary, 8/7/20.

video conference hearing was held on February 7, 2022, and the permanency review order issued following that hearing indicates that LCCYS has made reasonable efforts to finalize Child's permanency plan and is seeking permanency for Child through adoption. Permanency Review Order, 2/7/22.

The involuntary termination and goal change hearing was held on February 25, 2022. At the hearing, the orphans' court heard the testimony of Mother and seven witnesses for LCCYS. Mother, who was incarcerated in the Beaver County jail, participated remotely.[3] Present at the hearing were both legal counsel for Child and Child's guardian *ad litem*, as well as counsel for Mother, the unknown father, and LCCYS. Following the hearing, on February 28, 2022, the orphans' court issued an order stating that it would schedule a hearing for additional testimony if M.M., the possible father named by Mother, was determined to be Child's natural father, and if the paternity tests proved him not to be the father, it would make its ruling regarding Mother and the unknown father. Order, 2/28/22.

Following receipt of the paternity test results, the orphans' court issued its July 18, 2022 order, finding, *inter alia*, that:

> "[t]he conditions which led to the removal and placement of [Child] (with the exception that [Mother] now claims to have a lease on an apartment in the Pittsburgh area) still remain and have not been resolved or cured by [Mother]. Unfortunately, the

---

[3] Although there was testimony that Mother was convicted of a DUI in August or October of 2021, N.T., 2/25/22, at 20, the orphans' court noted in its opinion that "no evidence was presented to the [c]ourt as to why Mother was [incarcerated at the time of the termination hearing] or as to how long she would remain incarcerated." Orphans' Court 1925(a) Opinion at 6.

location of the services chosen by [LCCYS] to aid [Mother] in obtaining reunification with [Child] were located approximately fifty miles from [Mother's] home. With regard to [Mother's] missing one-half of the scheduled visits with [Child], it appears that the missed visits were a result of [Mother's] lack of adequate transportation.

Orphans' Court Order, 7/18/22 ("7/18/22 Order"), Findings of Fact, #25. The orphans' court concluded that:

[Child] has been removed from the care of [Mother] for a period well in excess of six months (nineteen months) and the conditions which led to the removal and placement of [Child] continue to exist. The efforts of [LCCYS] to provide programs and counseling to assist Mother in remedying her parental defects would have been adequate if [Mother] was residing in the Lawrence County, Pennsylvania area. However, because [Mother] is residing in Pittsburgh, Pennsylvania (Allegheny County) and did not have adequate transportation to the services as arranged, the services to aid in reunification were inadequate. [Mother] needed programs and services closer to her home. Because such services were not provided, this Court is not convinced at this point in time that [Mother] cannot and will not remedy the conditions that led to the removal of [Child]. [Mother] has not made progress sufficient to allow the return of [Child] to [Mother] and this [c]ourt will consider at a later date whether or not [Mother] will be able to remedy the conditions within a reasonable time once adequate services to aid [Mother] in parenting and reconciliation have been provided to [Mother].

*Id*., Conclusions of Law, #27. The orphans' court further concluded that due to the fact that LCCYS had not provided the programs and services that Mother needed, it was unable to determine to a clear and convincing standard that terminating Mother's parental rights to Child was in Child's best interests. *Id*., Conclusions of Law, #28.

LCCYS filed a timely notice of appeal on August 17, 2022. Before this Court, LCCYS presents the following questions:

1. Whether the lower court committed an error of law when it found that [LCCYS] failed to make reasonable efforts, and as a result could not find clear and convincing evidence that [LCCYS] had proved grounds for termination and for a change of goal?

2. Whether the lower court committed an abuse of discretion when it found that [LCCYS] failed to make reasonable efforts toward reunification, and as a result could not find clear and convincing evidence that [LCCYS] had proven grounds for termination and for a change of goal?

LCCYS's Brief at 6.

We apply the following standard of review in this appeal:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon determination of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In the Interest of J.R.R.*, 229 A.3d 8, 11 (Pa. Super. 2020) (citation omitted).

Here, the burden is upon LCCYS, as petitioner, to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *In the Interest of L.W.*, 267 A.3d 517, 522 (Pa. Super. 2021). The clear and convincing evidence standard is defined as "testimony that is so clear, direct, weighty and convincing as to enable the

trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Id.* (citation omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act. "Subsection (a) provides eleven enumerated grounds describing particular conduct of a parent which would warrant involuntary termination[.]" *In re Adoption of C.M.*, 255 A.3d 343, 359 (Pa. 2021); *see* 23 Pa.C.S. § 2511(a)(1)-(11). If the orphans' court determines the petitioner established grounds for termination under subsection 2511(a) by clear and convincing evidence, the court must then assess the petition under subsection (b), which focuses on the child's needs and welfare.[4] *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

In its petition, LCCYS included as grounds for termination subsections (a)(5) and (a)(8), which provide as follows:

_____

[4] Section 2511(b) states:

> **(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental facts such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(b).

**(a) General rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

---

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

---

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

---

23 Pa.C.S. § 2511(a)(5), (8); **See** Involuntary Termination of Parental Rights of the Natural Parents, 9/23/21.

Before this Court, LCCYS avers that the orphans' court erred as a matter of law when it based its denial of the petition on the determination that the agency failed to make reasonable efforts.[5] LCCYS's Brief at 36. LCCYS argues that of the two grounds for termination named in its petition, only one,

---

[5] In a Pennsylvania Supreme Court case relevant to this appeal, the Court acknowledged that we employ a *de novo* standard of review when faced with questions of law, "such as in this case, regarding whether an agency must provide reasonable services to a parent before a court may grant a petition seeking termination of parental rights." **In re D.C.D**. 105 A.3d 662, 671 (Pa. 2014).

- 10 -

subsection 2511(a)(5), requires consideration of reasonable services available to the parent.  LCCYS cites the decision of the Pennsylvania Supreme Court in *In re D.C.D.*, 105 A.3d 662, 673 (Pa. 2014), wherein the Court recognized, *inter alia*, that the legislature has considered the reasonable services available to the parent in regard to subsection 2511(a)(5) (providing for consideration of whether "the services or assistance reasonable available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time") but where such language is not present, as in, e.g., subsection 2511(a)(2), it would be improper to add such an element by judicial fiat.[6]  *Id*.  LCCYS asserts that it established, by clear

---

[6] In *In re D.C.D.*, the Supreme Court found that our Court erred in reversing the trial court's termination of a father's parental rights under subsection 2511(a)(2) as a result of the agency's failure to provide reasonable efforts to enable father, who was incarcerated and serving a 7 ¾ to 16-year sentence, to reunify with the child.  Our Supreme Court concluded that the agency's "reasonable efforts" were not elements of the statutory grounds to terminate parental rights pursuant to § 2511(a)(2), reasoning:

> Neither subsection (a) or (b) requires a court to consider the reasonable efforts provided to a parent prior to termination of parental rights.  Nevertheless, this Court has observed that the provision or absence of reasonable efforts may be relevant to a court's consideration of both the grounds for termination and the best interests of the child.  For example, as applicable to subsection (a)(2), a court may find an agency's lack of assistance to a parent relevant to whether a parent's incapacity "cannot or will not be remedied by the parent."  23 Pa.C.S. § 2511(a)(2).  Indeed, we agree with Father that, at least in a situation involving a strong bond between parent and child prior to incarceration and a short term of incarceration, that a child welfare agency cannot refuse reasonable efforts to an incarcerated parent and then point

*(Footnote Continued Next Page)*

and convincing evidence, the grounds for termination of parental rights under subsection 2511(a)(8) and the orphans' court erred in denying its termination petition under that subsection. LCCYS further contends that even if the reasonable efforts it has made are relevant, a review of both the testimony and the dependency record support the finding that reasonable efforts were in fact made. LCCYS's Brief at 42.

Initially, we note that the orphans' court did not name the specific subsection of Section 2511 it considered with regard to the termination of Mother's parental rights in either its 7/18/22 Order, which contains detailed findings of fact and conclusions of law, or in its Pa.R.A.P. 1925(a) opinion

_____

to the resulting erosion in the parental bond created by the agency as justification of parental rights. The fact that such a scenario can be articulated, however, does not transform the provision of reasonable efforts to reunite parents and children into a requirement for termination. Nothing in the law goes so far, and the Superior Court erred in so holding.

Further, while we acknowledge that other states have included reasonable efforts as either an element or merely a factor in their termination provisions, the Pennsylvania legislature has not incorporated reasonable efforts into the language of 23 Pa.C.S. § 2511(a)(2), and it would be improper and, indeed, unwise for this Court to add such an element to the statute by judicial fiat.

In contrast, we recognize that the legislature included consideration of the reasonable services available to the parent in regard to another ground for termination, subsection 2511(a)(5) (providing for consideration of whether "the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or replacement of the child within a reasonable period of time").

105 A.3d at 672-73.

- 12 -

issued on September 30, 2022. Indeed, the orphans' court only mentions Section 2511 once in its order, in a section relating to the parental rights of the unknown father. See 7/18/22 Order at 7. However, we can glean the orphans' court's reasoning with respect to subsections 2511(a)(5) and (a)(8) from the court's findings of fact and conclusions of law.

We first address the orphans' court's determination that LCCYS did not meet its burden in proving that Mother's parental rights should be terminated under subsection 2511(a)(5). To satisfy the requirements of Section 2511(a)(5), the moving party must produce clear and convincing evidence regarding the following elements: (1) the child has been removed from parental care for at least six months; (2) the conditions which led to the child's removal or placement continue to exist; (3) the parent cannot and will not remedy the conditions which led to removal or placement within a reasonable period of time; (4) the services reasonably available to the parent are unlikely to remedy the conditions which led to removal or placement within a reasonable period of time; and (5) the termination of parental rights would best serve the needs and welfare of the child. 23 Pa.C.S, § 2511(a)(5); *In re Adoption of M.E.P.*, 825 A.2d 1266, 1273-74 (Pa. Super. 2003).

Essentially, the orphans' court concluded that, notwithstanding its findings that Child has been removed from Mother's care for nineteen months and the conditions which led to Child's removal continue to exist (the first two conditions set forth in subsection (a)(5)), it could not reach a determination as to whether Mother cannot and will not remedy the conditions which led to

- 13 -

the removal of Child (the third element set forth in subsection (a)(5)) since the court found that the services offered by LCCYS were inadequate. Further, the order clearly states that the orphans' court cannot "determine to a clear and convincing standard that terminating Mother's parental rights to the minor child is in the best interest of the child," the language of the final element set forth in subsection (a)(5). 7/18/22 Order at 6.

Here, LCCYS acknowledges that the provision of reasonable efforts may be relevant to the orphans' court's consideration under subsection 2511(a)(5), **see In re D.C.D., supra**, but argues that the services it offered were more than reasonable.

Mother testified that she attempted intensive outpatient mental health treatment twice at the Greenbriar, a Pittsburgh treatment facility, but was unable to complete the program, once after she lost her housing at a three-quarter house in Pittsburgh and missed too many appointments, and on the second attempt when she ran out of funds and had to leave Pittsburgh. N.T., 2/25/22 ("N.T."), at 25-26. When Mother was questioned regarding that fact that she missed approximately half the scheduled visits with Child at LCCYS's visitation house she did not dispute the numbers, but added that those visitations did not include the times that she had visited Child while he was spending alternate weekends at the home of her mother, Child's grandmother, in Venango County. **Id.** at 30. Mother attributed her unsatisfactory visitation record to the fact that Child had been placed at facilities in Lawrence County, she didn't have transportation, and "it was very hard for [her] to get anywhere

if there was not a bus line." ***Id***. at 17.  She stated that she had failed to "follow through" with parenting skills classes through her own fault, and had left the family reunification program when her funds ran out and she had to leave Pittsburgh.  ***Id***. at 21-23.  Mother indicated that while she had never completed mental health treatment, she was attempting to do that now, while incarcerated at Beaver County jail, and stated she was wait-listed for parenting classes and was receiving mental health treatment there.  ***Id.*** at 21-22.

LCCYS former caseworker Molli Mucha testified that she was assigned Mother's case in the summer of 2020 and worked with her until she left the agency in May 2021.  N.T. at 35-36.  Ms. Mucha began working with Mother immediately following her discharge from the Pittsburgh intensive outpatient treatment facility, and testified that Mother subsequently also began treatment, but was then discharged from A.B.C. treatment, in Beaver County. ***Id.*** at 38.  She recalled that Mother had issues with regard to insurance, and stated that she was frequently waiting for insurance cards to come in so that she could receive mental health treatment.  ***Id.*** at 39; ***see also*** N.T. at 112 (indicating that Mother received insurance through Venango County).

Ms. Mucha also referred Mother to family reunification at the Child Advocacy Center ("CAC") in Lawrence County, where she failed to successfully complete the program.  ***Id.*** at 40.  She stated that it was on ongoing issue with Mother to try to figure out where she was staying, and that she did her best to set up treatments for Mother wherever she was.  ***Id.*** at 41.  With

regard to Mother's inconsistent visits with Child at the visitation house, Ms. Mucha stated that at the time she began to work with Mother, Mother was living in Pittsburgh, so there were transportation issues with regard to those visits. *Id*. at 44, 59. The caseworker testified that she believed that Mother's frequent moves were attributable to her obtaining new jobs, and Mother's desire to live closer to the places where she found employment. *Id*. at 62.

Ms. Tanya Montgomery, an employee of Cray Youth and Family Services who supervised Mother's visits with Child, testified that of twenty of Mother's missed visits, eight were not confirmed by Mother twenty-four hours in advance as required; she was late or did not arrive at all four times; she was ill on two occasions; she had a court hearing or was in jail on two occasions; Child's grandmother contacted the foster mother to inform her that Mother would not be visiting one time; and she did not have transportation or the Uber driver did not show up on three occasions. *Id*. at 67.

Katherine Kerr, a LCCYS caseworker, assumed responsibility for Mother's case after Ms. Mucha left the agency. She testified that although Mother seemed to be open to services at their first meeting, which was conducted in Beaver County, it was difficult to get in touch with her, and she rarely received a response from the frequent texts and follow-ups she sent. *Id*. at 109-110. Ms. Kerr testified that when she first met Mother in 2021, Mother told her that she had not completed any mental health treatment, did not have a drug and alcohol assessment, and had not completed any parenting classes at that time. *Id.* at 116. Ms. Kerr stated that she reviewed every

contact in LCCYS's database prior to the hearing, and "between the halfway houses, the three-quarter houses and the addresses [LCCYS] received, [she] counted 19 moves, and that is not including any time in jail." *Id*. at 110.

Kristen Clark, a family reunification counselor at CAC in Lawrence County, testified that she was referred Mother's case in July 2020; in order to accommodate Mother, who was living in Beaver County, they made plans to meet at Cray House, following Mother's weekly visitation with Child, to complete the intake process for the parenting services there, thus relieving Mother of the need to travel to Lawrence County an additional time. *Id*. at 86-87. Mother could not remain after the visit for the reunification counseling session, and a meeting was scheduled for the following week; however, Ms. Clark did not hear from Mother throughout August and until September 21, 2020, when they met again and Mother explained that she had moved to Beaver Falls, to another three-quarter house. *Id*. at 87. Mother was unable to meet at Cray House with Ms. Clark for another parenting class beginning in October, so Ms. Clark arranged for Mother to telephone in for counseling sessions, but Mother had bad phone reception and could not participate in that manner. *Id.* at 88. Ms. Clark last spoke with Mother in late October, but Mother missed two more classes; she then sent a letter to Mother indicating she had missed seventeen appointments, but the letter was returned due to a bad address, and Mother's case was closed out by the agency in November 2020. *Id*. at 88-89. Ms. Clark stated that after her letter to Mother was returned, she contacted Ms. Mucha, the LCCYS caseworker, who informed her

that Mother did not have a permanent address with LCCYS at that time.  *Id*. at 91.  Ms. Clark acknowledged that if Mother had been living in Lawrence County, she could have offered Mother bus passes or even possibly an agency vehicle for transportation.  *Id.* at 90.

In late August 2021, Akilah Daniels, a family support specialist with Lawrence County Community Action Partnership, an entity that provides parenting classes to parents in jeopardy of losing their parental rights, was referred to Mother.  *Id.* at 94-45.  She testified as to her repeated attempts to contact Mother by phone calls, voicemails and follow-up texts throughout September 2021, including one call wherein Mother answered the phone but when Ms. Daniels identified her name and affiliation, Mother made no further response.  *Id*. at 95-97.  Mother's case with the partnership was formally closed on September 30, 2022.  *Id.* at 98.

We observe that the record supports a conclusion that LCCYS attempted throughout the case to accommodate Mother in myriad ways despite her constant address changes, many of which were unknown to LCCYS through no fault of its own, and did, in several instances, offer services to Mother in both Allegheny and Beaver Counties.  Moreover, we are disturbed by the fact, as evidenced in the dependency record, that the orphans' court conducted regular permanency hearings at which it might have redirected the efforts at reunification had it deemed it advisable, and did not do so, instead finding consistently that LCCYS was properly supervising Mother and that its efforts toward the goal of reunification were reasonable.  However, we are ever

- 18 -

mindful that the abuse of discretion standard in termination cases is highly deferential, and we must affirm the orphans' court's decision even where evidence exists that would support a contrary determination. *In re P.Z.*, 113 A.3d 840, 849 (Pa. Super. 2015). This Court may not search the record for contrary conclusions or substitute its judgments for that of the orphans' court. *Interest of S.K.L.R.*, 265 A.3d 1108, 1124 (Pa. 2021). The record here in fact clearly shows that the bulk of the services offered to Mother were in Lawrence County locations not easily accessible to where she was residing. Accordingly, we will not disturb the orphans' court's determination, viewed under subsection 2511(a)(5), that LCCYS failed to provide clear and convincing evidence sufficient to warrant the termination of Mother's parental rights.

We move then to a consideration of LCCYS's other argument, that the evidence it presented under subsection 2511(a)(8) clearly and convincingly demonstrated the requisite grounds for termination of Mother's parental rights. To terminate parental rights under Section 2511(a)(8), the petitioner must prove: (1) the child has been removed from parental care for 12 months or more from the date of the removal; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child. *In re K.Z.S.*, 946 A.2d 753, 759 (Pa. Super. 2008). With respect to any petition filed pursuant to subsection (a)(8), "the court shall not consider any efforts by the parent to remedy the conditions described therein which are first

initiated subsequent to the giving of notice of the filing of the petition." 23 Pa.C.S. § 2511(b). Termination under subsection 2511(a)(8) does not required the court to evaluate a parent's current willingness or ability to remedy the conditions that initially caused the placement, or the availability or efficacy of the services provided by the local children and youth agency. *K.Z.S.*, 946 A.2d at 759. Here, the orphans' court properly found that Child had been removed from Mother's care for more than 12 months and that the conditions that led to Child's removal still existed.[7] The orphans' court, concluded, however, that LCCYS failed to present clear and convincing evidence that termination was in Child's best interests, the third element necessary in an analysis under subsection 2511(a)(8).

In its order, the orphans' court noted that LCCYS's petition does not make any allegation that Mother abandoned Child, and that all of the visits with Child that Mother attended at the visitation house went well. *Id*. at 3, 5. The orphans' court further concluded that during the nineteen months that Child has been in LCCYS's custody and placed in a foster home, "[M]other has maintained a relationship and bond with [Child]." *Id*. at 5. The orphans' court noted that Mother had completed her drug program at the Alpine Spring rehab facility and started, but failed to finish, other programs that were suggested in the New Castle, Lawrence County area. *Id.* at 6. The orphans' court stated:

---

[7] In its 7/18/22 Order, the orphans' court acknowledged Mother's testimony that she now has a lease for an apartment, which she acquired in December, 2021, a date after the filing of the petition to terminate her parental rights. 7/18/22 Order at 3.

During the time that [Child] has been in the custody of LCCYS, [Mother] has maintained contact with [Child] and by all accounts, including the testimony of the LCCYS caseworker who handled the case from its initiation until May 2021, [Mother] and Child have a strong bond. According to this witness, [Child] was always excited to see [Mother] when she came for a visit and the visits were always appropriate. At all times, during this case, [Mother] lived in the Pittsburgh and Beaver County areas and had transportation problems that were well known to LCCYS. [Mother] made it to 19 of the 36 scheduled visits (2 other visits were cancelled by the foster parents) and made it known to the caseworker that she was having difficulty finding transportation from the Pittsburgh/Beaver County area to the Lawrence County visitation house. Also, during the time that [Child] has been in custody, [Mother] had made arrangements with the foster parents to have video conference visits with [Child], which occurred on average two or three times each week and often included video meeting with [Child] every day of the week, and sometimes several times in a day. By all accounts, the video conferences went well.

*Id*. at 4-5. Mother testified, in response to a question about her relationship with Child:

I'm his mother. You got to teach at child at – at their level. I am not his friend, I'm his mother. So when he doesn't do something he's [ ] supposed to do, I do – I'm stern and I tell him, [ ], you cannot do that; you were told twice, now you have to go to time out. I am – my father was very strict and beat me a lot, and I had a mother that protected me, so I know the difference in the boundaries of friend, teacher, parent. I love him and I'm going to protect him and sometimes that means protecting him from myself. You know, that's why I wanted to go to rehab… I'm not a friend, I'm his mom. So I teach him in a fun-loving stage for a 4-year-old, and I don't think anything of how I taught him or how I was with him is any different from how my mom interacts with him.

N.T. at 32-33.

The orphans' court noted the testimony of Larry Puntureri, Esq., Child's guardian *ad litem* ("GAL"), who did not file a brief in this appeal, but who participated at the termination hearing and expressed his views on the record at its conclusion. *See* N.T. at 129-132. Child's GAL acknowledged that Mother's mental health is of concern, but noted that she is presently receiving treatment while incarcerated and emphasized her testimony that she has been clean and sober for over a year. *Id*. at 130. He pointed out that Mother has maintained constant contact with Child throughout the case and that she has been unable to take full advantage of the services offered by LCCYS because she has not resided in Lawrence County. *Id*. at 132. Child's GAL concluded that it would not be in Child's best interest to terminate Mother's parental rights. *Id*.

Child's legal counsel, Eugene Tempesta, Esq. stated on the record at the hearing that his concerns were Mother's inconsistency and instability, but he believed that given that "logistics and the geography" may be the reason, he preferred to err on the side of caution and was not in favor of involuntary termination. *Id*. at 132-33. Notwithstanding this testimony, Child's legal counsel filed a brief in this Court in which he joined in LCCYS's appellate brief, asserting that the orphans' court erred and abused its discretion and that LCCYS had provided clear and convincing evidence that grounds for termination of Mother's parental rights existed and a goal change from reunification to adoption was appropriate.

Upon review of the certified record, the parties' briefs, the applicable law, and the orphans' court's opinion, we conclude that, consistent with our Supreme Court's direction in **In re D.C.D**., the orphans' court was free to consider the services offered to Mother by LCCYS in regard to subsection 2511(a)(5) (providing for consideration of whether Mother "cannot or will not remedy the conditions which led to removal or placement within a reasonable period of time") and was within its discretion in determining that LCCYS failed to meet its burden under either subsection 2511(a)(5) or 2511(a)(8). Accordingly, we affirm the orphans' court's decision to deny the goal change to adoption and the petition to terminate Mother's parental rights.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date:  3/8/2023